## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br><br>JONATHAN QUINN CARTER,<br>Defendant. | Case No. 25-cr-73-CJW<br><br>**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS** |

_____

## I.    INTRODUCTION

On September 9, 2025, the Grand Jury returned an Indictment charging Defendant with two counts of Distribution of a Controlled Substance in violation of 21 U.S.C. Sections 841(a)(1) and 841(b)(1)(A). (Doc. 3.) On January 28, 2026, the Grand Jury returned a Superseding Indictment charging Defendant with five counts of Distribution of a Controlled Substance in violation of 21 U.S.C. Sections 841(a)(1), 841(b)(1)(A), and 851 (Counts 1-4, 6) and three counts of Distribution and Aiding and Abetting the Distribution of a Controlled Substance in violation of 18 U.S.C. Section 2 and 21 U.S.C. Sections 841(a)(1), 841(b)(1)(A), and 851 (Counts 5, 7-8). (Doc. 42.)

The matter before me is Defendant's motion to suppress. (Doc. 18.) Attached to the motion is Defendant's Inventory (Waterloo Police Department incident report (supplemental)) of items to be suppressed which includes: two cell phones, two Ziploc bags of methamphetamine, and statements to an investigator at the scene of the traffic stop.[1] (Doc. 18-1.) The Government filed a timely Resistance. (Doc. 19.) Defendant filed a Supplement to his motion which indicated that he anticipated calling Eric Ruth as

---

[1] At the hearing held on January 6, 2026, Defendant was granted leave to amend the inventory to seek exclusion of the statements he made to an investigator at the scene. (Doc. 50 at 3-5.)

Case 1:25-cr-00073-CJW-MAR    Document 56    Filed 03/05/26    Page 1 of 23

a witness at the hearing.  (Doc. 20.)  Defendant filed a Reply to the Government's Resistance.  (Doc. 24.)  The Government filed a Response to the Defendant's Reply to the Government's Resistance.  (Doc. 31.)  On January 30, 2026, Defendant filed a post-hearing Supplemental Brief.  (Doc. 45.)  On February 6, 2026, the Government filed a Resistance to Defendant's Supplemental Brief.  (Doc. 47.)  The Honorable C.J. Williams, Chief United States District Court Judge, referred the motion to me for a Report and Recommendation.  I held a hearing on Defendant's motion to suppress on January 6, 2026, and on January 27, 2026.  (Docs. 32, 39.)

At the hearing held on January 6, 2026, the following Government Exhibits 2 through 5 were admitted without objection:

2. Illinois State Police arrest sheet;

3. Law enforcement records (27 pages);

4. Records regarding August 21, 2025 incident; and

5. Body camera video.

The Government called five witnesses: Detective[2] Nicholas Berry[3], Detective Chris Roberts[4], Special Agent Richard Vale[5], Trooper Ames Helzer[6], and Deputy Jesse Lenz.[7] I found the witnesses credible.

Also at the January 6, 2026 hearing, Defendant's Exhibit A, the body camera video of Deputy Lenz was admitted without objection. At the January 27, 2026 hearing, Defendant's Exhibit B, an Uber reservation email, was admitted without objection. Defendant called Uber driver Eric Ruth. I found him credible. For the following reasons, I respectfully recommend that the District Court **deny** Defendant's Motion to Suppress.

---

[2] The titles "Investigator" and "Detective" were used somewhat interchangeably at the hearing, but Detective Roberts testified "Detective" is preferred. (Doc. 50, Roberts Hr'g Test. at 86.)

[3] Detective Berry is employed by the Waterloo Police Department. He is currently assigned as a full-time task force officer for the FBI in conjunction with the Tri-County Drug Task Force. He has been assigned to the FBI since approximately 2018 and has been assigned to the Tri-County Drug Enforcement Task Force since 2009.

[4] Detective Roberts is employed by the Waterloo Police Department. He is currently assigned to the Tri-County Drug Enforcement Task Force.

[5] Special Agent Vale is employed by the Iowa Division of Narcotics Enforcement ("DNE"). He is currently assigned to the Tri-County Drug Enforcement Task Force. Prior to working for the DNE, Special Agent Vale was a Coralville Police Officer and a detective assigned to the Johnson County Drug Enforcement Task Force.

[6] Trooper Helzer is employed by the Iowa State Patrol. He has been a state trooper for four years. Prior to joining the Iowa State Patrol, Trooper Helzer was a deputy sheriff with the Buchanan County Sherrif's Office for two years and a police officer with the North Liberty Police Department for two years.

[7] Deputy Lenz has been employed by the Johnson County Sheriff's Office since 2014 and has been a canine handler since 2018.

3

## II.    FINDINGS OF FACT

### A.    The Drug Trafficking Investigation Preceding the August 21, 2025 Traffic Stop

Law enforcement first became aware of Defendant through a Cooperating Source ("CS") who identified Defendant as a source of methamphetamine.[8]  As a result, law enforcement set up multiple controlled drug purchases between the CS and Defendant. Law enforcement was aware that the CS had a lengthy criminal history and was "working off" pending drug-related charges in other cases and, therefore, had access to methamphetamine, possibly from other sources.  (Doc. 50, Roberts Hr'g Test. at 60-61.)

On June 16, 2025, the CS told law enforcement that Defendant was returning to Iowa from Chicago, possibly with a quantity of methamphetamine.  Law enforcement had the CS set up a controlled drug purchase with Defendant.  Defendant directed the CS to meet him at a gas station in Cedar Rapids to purchase methamphetamine.  The CS was provided $2,000 by law enforcement and went to the gas station to meet Defendant.  Law enforcement surveilled the gas station and observed Defendant exit a vehicle, approach the CS's vehicle, and exchange methamphetamine with the CS for the $2,000 provided by law enforcement.  (Gov. Ex. 3 at 1.)  In none of the controlled purchases involving Defendant is he visible on the video recordings made by the CS, nor do the recordings contain any drug-related statements by Defendant.  (Doc. 50, Roberts Hr'g Test. at 59-60, 63.)  Similarly, the text messages from Defendant to the CS that Detective Roberts saw did not contain any drug-related discussion.  (*Id.* at 67.)

Detective Chris Roberts drafted a report regarding the June 16 controlled buy. Detective Berry did not author a report and could not recall if Defendant entered the CS's vehicle.  Nor did Detective Berry see Defendant make an exchange with the CS.  (Doc.

---

[8] Detective Roberts testified that the CS told law enforcement that Defendant was "possibly" obtaining methamphetamine in Chicago for redistribution in Iowa.  (Doc. 50, Roberts Hr'g Test. at 52.)

50, Berry Hr'g Test. at 26.) Detective Berry did not see Defendant carrying anything or see any bulges on his person. (*Id.* at 27-28.)

On June 19, 2025, the CS called Defendant and arranged another controlled drug purchase. Defendant told the CS to meet him at a Dollar Tree store in Cedar Rapids to purchase methamphetamine. The CS was provided $2,000 by law enforcement and went to the Dollar Tree to meet Defendant. Law enforcement surveilled the Dollar Tree and observed Defendant arrive and the CS enter the front passenger seat of Defendant's vehicle. After the meeting, the CS told law enforcement that the CS gave Defendant the $2,000 provided by law enforcement in exchange for the methamphetamine. (Gov. Ex. 3 at 3.) During arrangements for this transaction, law enforcement learned Defendant was "getting low on methamphetamine" and the following day his phone and the Chevrolet Malibu he was driving were "showing locations" in the Chicago area. (*Id.* at 5.) By this point, law enforcement believed that Defendant was the source for others such as AM, but there were no "controlled buys" or conversations between Defendant and AM.[9] (Doc. 50, Berry Hr'g Test. at 28-29.) During this transaction, law enforcement did not witness a hand-to-hand exchange between Defendant and the CS. (Doc. 50, Roberts Hr'g Test. at 64.) Law enforcement did not witness Defendant carry anything to the Malibu. (*Id.* at 65.) Detective Roberts's reports for June 16 and June 19, 2025 were not written until almost six weeks after the events described and were, therefore, less detailed. (*Id.*) While Detective Roberts's reports for these two controlled purchases do not say that he searched the CS prior to the controlled purchases, he testified that he recalls having done so for all the controlled purchases. (*Id.* at 66, 84.)

---

[9] While Defendant referred to the absence of any "controlled buys" between Defendant and AM (Doc. 50, Berry Hr'g Test. at 29), it does not appear from the police report that AM was a confidential source. (Gov. Ex. 3 at 5.) Thus, it is probably fair to assume that defense counsel was asking whether there was evidence of "drug transactions" rather than "controlled buys" between the two.

On July 7, 2025, law enforcement had the CS set up another controlled drug purchase of methamphetamine from Defendant. Law enforcement was aware that on July 7, 2025, Defendant had traveled from Chicago to Iowa. (*Id.* at 49.) Law enforcement officers observed Defendant meet with the CS at the predetermined location for a short period and then Defendant left the area. The CS told law enforcement that the CS exchanged the money provided by law enforcement for the methamphetamine with Defendant. (Gov. Ex. 3 at 11.)

On July 11, 2025, Defendant's phone appeared to be traveling from Chicago to Iowa. (*Id.* at 14.) The CS reported to Detective Berry that Defendant informed the CS that Defendant was returning home and inquired if the CS wanted methamphetamine. (*Id.*; Doc. 50, Roberts Hr'g Test. at 51.[10])

On July 14, 2025, the CS arranged another controlled drug purchase of methamphetamine from Defendant. They agreed to meet at a Dollar Tree store in Cedar Rapids. The CS was provided $2,000 by law enforcement and went to the Dollar Tree to meet Defendant. Law enforcement surveilled the Dollar Tree and observed Defendant arrive and the CS walk to Defendant's vehicle and enter it. After a brief conversation, the CS exited Defendant's vehicle and returned to the CS's car. After the meeting, the CS told law enforcement that the CS gave Defendant $2,000 in exchange for methamphetamine. (Gov. Ex. 3 at 15.) Detective Berry was conducting surveillance of Defendant's residence, but he did not see him carrying anything to the controlled buy. (*Id.* at 11; Doc. 50, Berry H'rg Test. at 35, 28.)

On July 22, 2025, the CS contacted Defendant to purchase methamphetamine in another controlled drug purchase. Law enforcement provided the CS $2,000. Law enforcement observed a female leave Defendant's residence and walk to the

---

[10] Detective Roberts was testifying about a report authored by Detective Berry.

predetermined location for the controlled drug purchase. The female entered the passenger side of the CS's vehicle. The CS gave the female a ride back to the area of Defendant's residence and law enforcement observed the female enter Defendant's residence. The CS told law enforcement that the CS had never seen the female before, and the CS purchased methamphetamine from her with the $2,000 provided by law enforcement. (Gov. Ex. 3 at 17.)

On July 30, 2025, the CS arranged for another methamphetamine purchase for $2,000. Law enforcement officers observed Defendant leave a restaurant in Cedar Rapids and enter a vehicle in the restaurant parking lot. The CS met with Defendant inside the vehicle. The CS told law enforcement that the CS purchased methamphetamine from Defendant for $2,000. (*Id.* at 19.)

On August 10, 2025, the CS contacted Defendant to purchase methamphetamine in another controlled drug purchase. Detective Roberts testified that this controlled purchase was set up shortly after Defendant returned to Iowa from Chicago. (Doc. 50, Roberts Hr'g Test. at 51-52.) Law enforcement provided the CS $2,000. Law enforcement surveilling the controlled drug purchase, observed a female walk up to CS's vehicle and exchange the $2,000 for methamphetamine. Law enforcement also observed the female return to Defendant's residence. The CS told law enforcement that the CS purchased methamphetamine from the female with the $2,000 provided by law enforcement. (*Id.* at 23.)

On August 11, 2025, law enforcement noticed Defendant's phone traveling to Chicago, apparently by bus. (*Id.* at 25.) On August 12, Defendant's phone was observed returning from Chicago. (*Id.*) Defendant was observed at the Trailways bus station in Iowa City with a gray backpack where he boarded another bus for Cedar Rapids. (*Id.*) Defendant was then observed at the Trailways bus station in Cedar Rapids and was driven in a Toyota RAV to a Dollar Tree store where he had a brief interaction with a person in

a black Chevrolet Cruze. (*Id.*) Defendant was then driven to his residence. Defendant later walked back to the Dollar Store where he had another interaction with the Chevrolet Cruze where he appeared to reach into the Cruze and drop something. (*Id.*) Detective Berry did not see this interaction himself. (Doc. 50, Berry Hr'g Test. at 40.)

On August 18, 2025, the CS contacted Defendant to purchase methamphetamine for $2,000. Defendant told the CS to go to a Family Dollar store in Cedar Rapids and call him back when the CS arrived. When the CS arrived at the store, he called Defendant. Law enforcement observed a male in a gray Pontiac drive to the store. The CS entered the Pontiac and exchanged $2,000 for methamphetamine. The CS told law enforcement that the CS purchased methamphetamine from the man with the $2,000 provided by law enforcement. (Gov. Ex. 3 at 26.)

Detective Roberts testified that on "at least a couple of occasions" controlled purchases were set up after law enforcement knew that Defendant had returned to Iowa from Chicago. (Doc. 50, Roberts Hr'g Test. at 49.) Additionally, on several occasions after Defendant had returned to Iowa from Chicago, the CS reported to law enforcement that Defendant had contacted him/her and communicated that Defendant could sell the CS methamphetamine. (*Id.*)

In addition to the controlled drug purchases, law enforcement also used an investigative technique involving a ping on Defendant's mobile telephone. Detective Berry explained that a ping permits a phone company to send a request to the device for its location and the device responds with its general location. (Doc. 50, Berry Hr'g Test. at 8-9.) Detective Berry testified that during the controlled drug purchases, law enforcement was able to corroborate the ping location, as the location of the ping was consistent with law enforcement physically seeing Defendant in the same location as the ping during the controlled purchases. (*Id.* at 9.) Using the ping on Defendant's phone, law enforcement monitored Defendant's location in June, July, and August 2025. Law

enforcement noted that Defendant took frequent trips to Chicago. Based on the totality of the investigation and his training and experience, Detective Berry testified that he believed Defendant's source was in Chicago. Detective Berry explained that based on the amount of methamphetamine the CS was purchasing in the controlled purchases and Defendant's frequent trips to Chicago, law enforcement believed that Defendant was traveling to Chicago to acquire methamphetamine for distribution in Iowa. Detective Berry stated that Chicago is major source location for methamphetamine that is brought into Iowa. Detective Berry also stated that he had worked other investigations where an individual under investigation for distributing drugs in Iowa was regularly traveling to Chicago to acquire methamphetamine for redistribution in Iowa. (*Id.* at 10-15.)

Additionally, Detective Roberts testified that law enforcement learned that, in November 2024, Defendant had been stopped in Illinois with a large quantity of methamphetamine. (Doc. 50, Roberts Hr'g Test. at 46.) Law enforcement obtained reports about the stop from Illinois law enforcement (Gov. Ex. 2) and found a news article about the stop through an internet search. (Doc. 50, Roberts Hr'g Test. at 46-47.) Detective Roberts could not recall the amount of methamphetamine mentioned in the article, the source of the article, or trustworthiness of the information in the article. (*Id.* at 57-59.) Detective Roberts testified that he believed that he had knowledge of the Illinois stop prior to the August 21, 2025 traffic stop pertinent to this case. Detective Roberts was aware of the stop in Illinois prior to August 21, 2025 but he did not recall if he had the Illinois State Police report at that time. (*Id.* at 58.) In any event, Detective Roberts testified that he became aware of the Illinois stop early in the investigation. (*Id.* at 47.)

9

**B. The August 21, 2025 Traffic Stop[11]**

On August 21, 2025, law enforcement was aware that Defendant was returning to Iowa from Chicago via a Trailways bus to Iowa City. Prior to Defendant arriving in Iowa City, Detective Roberts held an operational meeting outside the Johnson County Sheriff's Office. At the meeting, law enforcement discussed a potential traffic stop if Defendant entered a vehicle after arriving at the Iowa City bus stop. Detective Roberts informed law enforcement from the Iowa City Police Department, the Iowa State Patrol, and the Johnson County Sheriff's Office of the general investigation of Defendant and investigators' belief that Defendant was traveling to Iowa from Chicago with methamphetamine. (*Id.* at 52-53.) Special Agent Vale also spoke with the various law enforcement personnel. Special Agent Vale noted that in narcotics investigations, things are "fluid" and things constantly change so there is rarely a "specific set plan" of action. (Doc. 50, Vale Hr'g Test. at 97.) Special Agent Vale testified that the general plan discussed by law enforcement was to conduct a traffic stop and deploy a police canine if Defendant entered a vehicle. (*Id.*) All the various law enforcement officers were in communication on a common police radio channel during surveillance of the bus stop and surveillance of the Uber that Defendant entered after arriving at the bus stop.

---

[11] This section sets out the basic facts regarding the stop and search of the Uber in which Defendant was a passenger on August 21, 2025. For the reasons discussed below, I ultimately conclude that law enforcement had probable cause for the search regardless of any alleged traffic offenses. While there is some overlap, many of these facts are not as critical to my recommendation to deny the motion to suppress. Nevertheless, I think it is important for the Court to have some picture of what transpired on August 21, 2025. This may create difficulties for the parties in fashioning their objections where the facts I find that are not tethered to any legal conclusions. If this matter is referred to me again for a further report and recommendation, I intend to set forth again (and perhaps in greater detail) the facts pertaining to the August 21, 2025 traffic stop. The parties should feel free to object to any of these facts within 14 days of this order. In addition, it is my intention that the parties be permitted to reserve their objections about the facts relating to the other grounds for suppression until such time as they become more pertinent, i.e., if this is referred back to me.

After the planning meeting, officers set up surveillance on the Trailways bus station in Iowa City. Law enforcement observed Defendant exit a Trailways bus. Defendant was carrying a backpack and a duffle bag.[12] Defendant walked to a silver Ford Fusion, placed the duffle bag in the trunk, and entered the backseat of the vehicle with the backpack where his companion was located. This appeared to Detective Berry to be a rideshare service. (Doc. 50, Berry Hr'g Test. at 41.) A law enforcement officer relayed to the other officers that the Fusion had a headlight out.[13] Special Agent Vale followed the Fusion as it left the bus station, traveling on Clinton Street and then turning left onto Burlington Street. While on Burlington Street, Special Agent Vale observed the Fusion cross a white solid line into a bike lane. Special Agent Vale relayed this information to the other officers involved. Based on the traffic violations, Trooper Helzer pulled the vehicle over near the Vine Tavern on Highway 6 in Coralville, Iowa. Trooper Helzer spoke to the driver of the Fusion. The driver identified himself as Eric Ruth and told Trooper Helzer that he was an Uber driver and the two individuals in the back seat were his passengers.[14] Trooper Helzer asked Mr. Ruth to exit the vehicle. At approximately one minute and thirty-five seconds into Trooper Helzer's body camera footage,[15] Trooper Helzer told Iowa City police officers to have Defendant exit the Fusion. (Doc. 50, Helzer Hr'g Tr. at 123.) Trooper Helzer stated that law enforcement

---

[12] Detective Berry described a brief interaction between a "younger," "black male" who left with a duffle bag in another vehicle. (Doc. 50, Berry Hr'g Test. at 11-12.) While this interaction was discussed at the hearing, it is not particularly relevant. There is, for example, no reason to suspect Defendant made a drug transaction at the bus station with this person. Detective Berry did not observe any hand-to-hand transaction at this point. (*Id.* at 29.)

[13] At the continued suppression hearing, the Uber driver, Eric Ruth, confirmed that on August 21, 2025 the Fusion had a malfunctioning headlight. (Doc. 51, Ruth Hr'g Tr. at 14 (178).)

[14] Defendant and his girlfriend were the passengers. Defendant's girlfriend entered the Fusion prior to Defendant arriving at the Iowa City bus station. (Gov. Ex. 4.)

[15] Video from Trooper Helzer's body camera was not entered into evidence by either Defendant or the Government. However, at the first hearing, during cross-examination of Trooper Helzer, defense counsel played several portions of Trooper's Helzer's body camera footage in court.

wanted Defendant, and his belongings detained until a canine officer arrived on the scene. (*Id.*)  Trooper Helzer ran Mr. Ruth's driver's license and prepared a warning for the malfunctioning headlight.  (Gov. Ex. 4 at 5.)  However, on cross-examination defense counsel played Trooper Helzer's body camera video at approximately 6 minutes where an Iowa City police officer told Trooper Helzer to look like he was being busy.  (Doc. 50, Helzer Hr'g Test. at 126.)  The canine officer arrived on the scene at approximately nine minutes and twenty seconds into Trooper Helzer's body camera video and after the stop had been initiated.  (*Id.*)  Trooper Helzer confirmed that the traffic stop was prolonged such that had he "just prepared a citation for the traffic violations, the traffic stop would have likely been done prior to the K-9 officer arriving" on the scene.  (*Id.* at 122.)

When the canine officer arrived on the scene, he started the free air dog sniff near the front driver's door.  (Gov. Ex. 5 at 21:15:55.)  The dog, Echo, worked counterclockwise around the Fusion.  Deputy Lenz noted changes in behavior around the rear driver's side wheel well and around the driver's side front door.  (Gov. Ex. 4 at 7; Doc. 50, Lenz Hr'g Test. at 137.)  Ultimately, Echo alerted after lifting his front paws onto the driver's front door and briefly breaching the open window of the driver's door with his nose.  (*Id.*; Gov. Ex. 5 at 21:17:11-21:17:14.)  Deputy Lenz testified that Echo is trained to sit when he is in the strongest scent of drugs.  (Doc. 50, Lenz Hr'g Test. at 140.)  Here, Echo did not sit, but Deputy Lenz explained that because Echo's front paws were up on the door, he thought he was in a sit position, and his alert was equivalent to a sit.  (*Id.* at 140-41.)  Based on Echo's alert, law enforcement searched the vehicle. Officers found methamphetamine in the bag Defendant had previously placed in the trunk of the Fusion.

## III.    DISCUSSION

### A.    The Parties' Arguments

Defendant argues that law enforcement lacked probable cause to believe that the Fusion exhibited an equipment violation or committed a traffic violation; and therefore, the initial stop and seizure of the vehicle was unlawful.  (Doc. 18-2 at 2.)   Next, Defendant asserts that "[s]hould the Court determine that the initial seizure of the [vehicle] comported with the Fourth Amendment," the Court should find that "the duration of the stop offended the Fourth Amendment."  (*Id.* at 2-3.)  Defendant points out that "nearly ten minutes elapsed between the stop of the [vehicle] and the deployment of [the] police canine around the [vehicle]."  (*Id.* at 3.)  Defendant maintains that "[b]ecause law enforcement unduly prolonged a traffic stop to address alleged equipment and minor moving violations in order to accommodate the arrival of the police canine, the Court should find that the duration of the stop rendered the stop unreasonable and suppress all evidence discovered as a result of the unlawful prolonging of the stop."  (*Id.*)  Defendant argues that "[a]ssuming the lawfulness of the stop at both its inception and through the deployment of the police canine, . . . nonetheless . . . [the] canine sniff violated [Defendant's] rights to be free from unreasonable searches."  (*Id.*)  Defendant maintains that "an Uber passenger has a reasonable expectation of privacy because the passenger, by paying a fare, has contracted the right to exclude others from the Uber and determine its destination," and therefore, Defendant has standing to challenge the canine sniff and search of the Fusion's trunk.  (*Id.* at 5.)  Defendant contends that the canine did not alert to the presence of narcotics in the vehicle and "trespassed into the [vehicle] before alerting," and therefore "the canine sniff and/or search of the [vehicle] violated his rights under the Fourth Amendment[.]"  (*Id.*)

In response, the Government argues that "the traffic stop complied with the Fourth Amendment."  (Doc. 19-1 at 6.)  The Government maintains that law enforcement "had

13

probable cause to conduct the traffic stop because the Ford Fusion committed traffic violations," having a malfunctioning headlight, in violation of Iowa Code §§ 321.384(1) and 321.385, and/or the Fusion traveled in a bicycle path, in violation of Iowa City Code 9-8-4. (*Id.* at 8.) Alternatively, the Government argues that "[e]ven if the Court finds that that the Fusion did not have a non-functioning headlight and did not travel in the bicycle path, officers still had probable cause to conduct the traffic stop because officers had probable cause that [D]efendant possessed methamphetamine." (*Id.*) The Government also argues that "the traffic stop was supported by reasonable suspicion that criminal activity was afoot . . . regarding [D]efendant's involvement in possessing and distributing methamphetamine." (*Id.* at 9.) Further, the Government asserts that "officers were justified in conducting a warrantless search of the Ford Fusion because they had probable cause to believe that it contained methamphetamine" based on Defendant's "drug-related criminal history, the controlled purchases of methamphetamine from defendant, defendant's frequent trips to Chicago from Iowa, and defendant's methamphetamine-related communications with CS and the controlled purchases from defendant when defendant returned to Iowa from Chicago." (*Id.*) The Government also maintains that officers had probable cause to search the vehicle because "a trained dog alerted to the presence of a . . . narcotic emanating from the vehicle." (*Id.* at 10.) The Government contends that, to the extent Defendant argues that the traffic stop was illegally prolonged, such argument fails because law enforcement had a reasonable suspicion of additional criminal activity, allowing them to extend the stop. (*Id.*) (citing *United States v. Kitchen*, 149 F.4th 1019, 1024 (8th Cir. 2025)). Finally, the Government asserts that Defendant lacks standing to challenge the dog sniff and trespass. (*Id.* at 10-11) (citing *United States v. Jones*, 74 F.4th 941, 952 (8th Cir. 2023)).

 In reply to the Government's resistance, Defendant first argues that the Government did not have "carte blanche" to seize and search him merely because of his

status as a suspected drug dealer without more to show probable cause that law enforcement would find evidence of a crime. (Doc. 24 at 1-2.) Defendant further argues that he has standing to challenge the search of the Fusion. (*Id.* at 3.) Defendant asserts that as a:

> paying passenger who effectively subleased that vehicle for the duration of his trip, [he] had the power to instruct the driver to raise (or lower) the window for a number of reasons; including to keep out (or let in) warm (or cold) air, to prevent persons outside the vehicle from overhearing private conversations, and of course, to keep animals from intruding into their travels. The Defendant also had the ability to regulate access to the vehicle as Uber offers passengers the ability to choose between a private ride and a shared ride. Because the Defendant and his travel companion opted for a private ride, they possessed the power to exclude others from accessing the vehicle until they reached their destination. The totality of the circumstances also demonstrate that the Defendant had a property interest in the vehicle. Afterall, he paid money for the Uber's services. Moreover, that the Defendant placed his luggage into the trunk is consistent with his expectation that society respect the privacy of his property in the trunk and by extension the vehicle in which he placed his property.

(*Id.* at 3-4.)

In response to Defendant's reply, the Government argues that Defendant lacks standing to challenge the canine's trespass into the Fusion. (Doc. 31 at 2.) The Government asserts that "[t]o bring a trespass-based claim, a defendant must be able to maintain an action for trespass, and to be able to maintain an action for trespass, a defendant must have had some type of legally protected property interest in the vehicle at the time of the trespass" and because Defendant "has no legally protected property interest in the Uber driver's vehicle, he does not have standing to challenge the trespass." (*Id.*) Alternatively, the Government argues that "even if Defendant has standing to challenge the trespass, Defendant's trespass argument fails." (*Id.*) The Government maintains that Defendant's trespass argument fails because "(1) probable cause existed

before the canine entered the open window; (2) there was no trespass, and (3) the exclusionary rule should not be applied because the officer was entitled to rely on Eighth Circuit precedent allowing the dog sniff." (*Id.*)

In his Supplemental Brief, Defendant argues that he has standing to bring a trespass-based claim. (Doc. 45 at 1.) Defendant maintains that:

> a common carrier passenger (and especially a hirer) would in fact have a "trespass-based" claim against both the trespasser and the common carrier for interfering with their use of the Uber (i.e. the common carrier). In other words, a person who hires an Uber to convey them from point A to point B has standing to challenge a trespass against their enjoyment of the Uber.

(*Id.* at 3.)

In resistance to Defendant's Supplemental Brief, the Government argues that "Defendant, as a mere passenger in Eric Ruth's vehicle, did not have a legally protected interest in Ruth's vehicle at the time of the trespass" and therefore lacks standing to bring a trespass claim. (Doc. 47 at 1-2.) (Citing *United States v. Barraza-Maldonado*, 879 F.Supp.2d 1022, 1026-27 (D. Minn. 2012); *United States v. Cabrera*, 651 Fed. App'x 118, 121-22 (3d Cir. 2016)).

**B.** **_Analysis_**

**1.** **_Law Enforcement had probable cause to stop and search the Fusion._**

While this case presents interesting but possibly academic questions, I recommend the Court focus on one issue that may resolve the matter. The Court may differ with my conclusion and deem it necessary for me to address the other arguments raised: whether the traffic stop based on traffic violations was valid, whether the stop was unreasonably prolonged, Defendant's standing (or lack of it), the validity of the dog sniff, and the application of the exclusionary rule. However, I conclude that the law enforcement officers who had been investigating Defendant for drug trafficking and who were

surveilling Defendant's return to Iowa City from Chicago had probable cause to stop and search the Uber without regard to the alleged driving infractions and the dog sniff.

### a. Relevant law

"A law enforcement officer may conduct an investigative stop of a vehicle when he [or she] has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Pounds*, 70 F.4th 1106, 1108 (8th Cir. 2023) (quoting *United Sates v. Cortez*, 449 U.S. 411, 417-18 (1981)); *see also United States v. Fields*, 832 F.3d 831, 834 (8th Cir. 2016) ("A police officer 'may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'") (Quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Courts consider the "totality of the circumstances to determine whether an officer has a particularized and objective basis to suspect wrongdoing." *Pounds*, 70 F.4th at 1108 (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "When a team of law enforcement officers is involved in an investigation, the issue is whether all the information known to the team provided 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' the investigative stop." *United States v. Collins*, 883 F.3d 1029, 1032 (8th Cir. 2018) (per curiam) (quoting *United States v. Winters*, 491 F.3d 918, 921 (8th Cir. 2007), in turn quoting *United States v. Robinson*, 119 F.3d 663, 666 (8th Cir. 1997)).

Warrantless searches are per se unreasonable, with a few well-established exceptions. *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005). However, courts have long recognized the "automobile exception" to the Fourth Amendment. *United States v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003); *see generally Carroll v. United States*, 267 U.S. 132, 158-59 (1925). "The so-called 'automobile exception' permits police to conduct a warrantless search of an automobile if, at the time of the search, they

have probable cause to believe that the vehicle contains contraband or other evidence of a crime." *Kennedy*, 427 F.3d at 1140-41 (citations omitted); *see also United States v. Soderman*, 983 F.3d 369, 375 (8th Cir. 2020) ("Although a warrantless search usually constitutes a per se Fourth Amendment violation, the automobile exception to the Fourth Amendment's warrant requirement permits the warrantless search or seizure of a vehicle by officers possessing probable cause to do so"); *United States v. Schackleford*, 830 F.3d 751, 753 (8th Cir. 2016) ("Probable cause to believe that an automobile contains contraband or evidence of criminal activity as long been held to justify a warrantless search of the automobile and seizure of the contraband."). The burden is on the Government to justify warrantless searches. *Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984).

In *Wells*, the Eighth Circuit Court of Appeals articulated probable cause for searching a vehicle during a lawful traffic stop:

> "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000). . . . "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). "[W]hen police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may conduct a warrantless search of the vehicle, even after it been impounded and is in police custody." *Michigan v. Thomas*, 458 U.S. 259, 261, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982) (per curiam).

347 F.3d at 287-88.

"Probable cause for the stop and search of this vehicle may be based on the collective knowledge of all law enforcement officers involved in the investigation and need not be based solely upon information within knowledge of the officer(s) on the scene

18

if there is some degree of communication." *United States v. Rowe*, 878 F.3d 623, 628 (8th Cir. 2017) (citing *Shackleford*, 830 F.3d at 753-54). Further, "[t]he collective knowledge of law enforcement officers conducting an investigation is sufficient to provide reasonable suspicion, and the collective knowledge can be imputed to the individual officer who initiated the traffic stop when there is some communication between the officers." *United States v. Rederick*, 65 F.4th 961, 966 (8th Cir. 2023) (quoting *United States v. Thompson*, 533 F.3d 964, 969 (8th Cir. 2008)); *see also United States v. Jacobsen*, 391 F.3d 904, 907 (8th Cir. 2004) ("The patrol officer himself need not know the specific facts that caused the stop . . . [r]ather, the officer need only rely upon an order that is founded on reasonable suspicion.").

### b.      Application

Prior to the August 21, 2025 traffic stop, law enforcement knew the following information: (1) Defendant had a prior federal drug conviction (Gov. Ex. 1); (2) in November 2024, Defendant was arrested in Illinois following a traffic stop on Interstate 80 on a drug charge;[16] (3) between June 16, 2025 and August 18, 2025, law enforcement conducted eight controlled drug purchases involving Defendant or an individual on Defendant's behalf;[17] (4) using a ping on Defendant's phone, law enforcement monitored Defendant's location in June, July, and August 2025, noting that Defendant took frequent

---

[16] It is somewhat unclear when Detective Roberts learned all the details of the Illinois case. However, he was at least aware of the existence of the drug charge by August 21, 2025.

[17] Controlled drug purchases on June 16, 2025, June 19, 2025, July 7, 2025, July 14, 2025, and July 30, 2025 all involved Defendant directly. In the three other controlled drug purchases, the CS set up the controlled purchases with Defendant but ultimately obtained the drugs from different individuals. On July 22, 2025, a female who left Defendant's residence sold methamphetamine to the CS and returned to Defendant's residence after the controlled purchase. On August 10, 2025, the CS set up a controlled drug purchase with Defendant and a female delivered the drugs to the CS. After the controlled purchase, the female went to Defendant's residence. On August 18, 2025, the CS contacted Defendant to set up a controlled drug purchase. Defendant instructed the CS where to go and the CS purchased methamphetamine from a male at that place.

trips to Chicago, which Detective Berry believed was Defendant's source of drugs;[18] (5) the controlled drug purchases on June 16, 2025, July 7, 2025, and August 10, 2025, were all conducted shortly after Defendant returned to Iowa from Chicago; and (6) on August 21, 2025, law enforcement observed Defendant exit a bus from Chicago in Iowa City carrying a backpack and duffle bag and enter the Ford Fusion.

Based on the totality of the circumstances outlined above, I find that law enforcement had a particularized and objective basis to suspect criminal activity was afoot and stop the Ford Fusion. *See Pounds*, 70 F.4th at 1108. Detective Roberts testified that based on the totality of the drug investigation and the information outlined above, he believed law enforcement had probable cause to stop and search the Fusion for methamphetamine. (Doc. 50, Roberts Hr'g Test. at 82, 87.) Detective Roberts also testified that if no traffic violation had occurred, law enforcement would have had further discussion to pull over the Fusion based on probable cause from the investigation as outlined above. (*Id.* at 89.) Detective Roberts also explained that law enforcement likes to have probable cause to stop a vehicle based on a traffic violation because it is preferable if law enforcement has multiple bases of probable cause to stop and search a vehicle suspected of carrying drugs. (*Id.* at 90.) Detective Roberts also discussed the investigative technique of stopping and searching a vehicle based on a traffic violation and drug dog alert instead of based on probable cause from an investigation so as to not tip off the individuals in the vehicle of the drug investigation. (*Id.* at 90-91.) Detective

---

[18] At the hearing, Detective Berry testified that based on the amount of methamphetamine the CS was purchasing in the controlled purchases and Defendant's frequent trips to Chicago, law enforcement believed that Defendant was traveling to Chicago to acquire methamphetamine for distribution in Iowa. Detective Berry stated that Chicago is major source location for methamphetamine that is brought into Iowa. Detective Berry also stated that he had worked other investigations where an individual under investigation for distributing drugs in Iowa was regularly traveling to Chicago to acquire methamphetamine for redistribution in Iowa. (Doc. 50, Berry Hr'g Test. at 10-15.)

Roberts testified that prior to the stop he did not explicitly tell the other law enforcement officers that he believed there was probable cause to stop and search the fusion based on the overall drug investigation, but he did inform the other law enforcement officers of the drug investigation involving Defendant the belief that he was returning to Iowa from Chicago with methamphetamine. (*Id*. at 53, 74.) Indeed, Trooper Helzer testified that he knew about the larger drug investigation when he stopped the Fusion for the traffic violations. (Doc. 50, Helzer Hr'g Test. at 133.) Thus, in addition to the collective knowledge of the officers involved, *see Rederick*, 65 F.4th at 966, Trooper Helzer had knowledge of the larger drug investigation from the briefing and from communications with other officers involved in the investigation. Accordingly, I find that law enforcement had probable cause to stop and search the Fusion, as law enforcement had concrete reasons to believe that the Fusion contained methamphetamine. *See Kennedy*, 427 F.3d at 1140. Therefore, resolution of the various issues raised by the parties, such as the validity of the stop based on traffic violations, the length of the stop, Defendant's standing, the police dog's trespass, and application of the exclusionary rule are, for all practical purposes, unnecessary because law enforcement had probable cause to both stop and search the Fusion.

In his brief, but more so by cross-examination, Defendant has pointed out perceived deficiencies in the Government's investigation of individual controlled purchases and other aspects of the investigation before August 21, 2025. For example, Defendant points to the absence of drug-related discussion on recorded audio or video, instances where Defendant was not seen to be carrying anything or seen to make any hand-to-hand exchange, the CS's lengthy criminal history, and law enforcement's delay in writing certain reports. No doubt these would be important points to make to a jury if Defendant were on trial for distribution of controlled substances on these occasions. Similarly, Defendant posits innocent explanations for a person making repeated trips to

Chicago. Together, however, Defendant's attack on the Government's case misses the forest for the trees. Before the Court at this stage is not whether Defendant is guilty beyond a reasonable doubt on any of these suspected transactions, but whether law enforcement had probable cause to stop and search Defendant when he arrived back in Iowa from one of a series of trips to Chicago. Defendant had made repeated trips to Chicago and had methamphetamine available immediately thereafter to distribute. While an innocent explanation might be offered for the final Chicago trip (or any of the others, for that matter) a pattern had emerged that pointed to an on-going drug distribution operation wherein Defendant would personally travel to Chicago, return to Iowa, and then have methamphetamine available for distribution. Defendant is correct that law enforcement does not have "carte blanche" to stop and search someone merely because he is a suspected drug dealer. That argument might have gained better purchase had law enforcement stopped Defendant while walking around on August 22. In the event, on August 21, 2025, Defendant was surveilled leaving the bus station with the items he had in his possession when he exited the bus from Chicago. Defendant was then followed to the point where the traffic stop was ultimately effected. Under these circumstances, I recommend the Court conclude that law enforcement had probable cause to stop and search Defendant based on the drug-trafficking investigation that preceded the stop.

Accordingly, I recommend that the motion to suppress be denied.

### 2. *Defendant's other arguments*

Because of my firm conviction that there was probable cause to stop the Fusion based on the drug trafficking investigation, I recommend the Court not address Defendant's other bases to challenge the search and seizure. If, however, the Court disagrees with my conclusion regarding probable cause for the stop based on law enforcement's knowledge of the drug trafficking investigation, I recommend the Court

refer Defendant's motion back to me to address the other grounds Defendant has raised in support of suppression.

### IV.    CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendant's Motion to Suppress.  **(Doc. 18.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation.  Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.  *See* Fed. R. Crim. P. 59.  Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein.  *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir.  2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 5th day of March, 2026.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa