# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 25-CR-73-CJW-MAR |
| Plaintiff, | **ORDER** |
| vs. | |
| JONATHAN QUINN CARTER, | |
| Defendant. | |

_____

## I. INTRODUCTION

A Report and Recommendation ("R&R") by the Honorable Mark A. Roberts, United States Magistrate Judge, recommending that the Court deny defendant's motion to suppress, (Doc. 18), is before the Court. (Doc. 56). The government filed an objection. (Doc. 61). Defendant also filed an objection. (Doc. 64). For the following reasons, the government's objection is **overruled in part and sustained in part**, defendant's objection is **overruled**, the R&R is **adopted as modified**, and defendant's Motion to Suppress is **denied**.

## II. STANDARD OF REVIEW

When a party files a timely objection to a magistrate judge's R&R, a "judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Crim. P. 59(b)(3) ("The district judge must consider de novo any objection to the magistrate judge's recommendation."); *United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003) (noting that a district judge must "undertake [ ] a de novo review of the disputed portions of a magistrate judge's [R&R]"). "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); *see also*

1

Fed. R. Crim. P. 59(b)(3) ("The district judge may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions."). It is reversible error for a district court to fail to engage in a de novo review of a magistrate judge's R&R when such review is required. *Lothridge*, 324 F.3d at 600.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "a finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (cleaned up) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). A district judge may, however, elect to review an R&R under a more exacting standard even if no objections are filed. *See Thomas v. Arn*, 474 U.S. 140, 154 (1985).

### III. DISCUSSION

#### A. Procedural History

Defendant is currently charged via superseding indictment with eight counts: five counts of distribution of a controlled substance—ice methamphetamine—in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 851; and three counts of distribution and aiding and abetting the distribution of a controlled substance—ice methamphetamine—in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 851. (Doc. 42). The dates of the alleged conduct are June 16, June 19, July 7, July 14, July 22, July 30, August 10, and August 18, 2025. (*Id.*).

On November 13, 2025, defendant filed a motion to suppress, requesting suppression of "any evidence obtained as a result of the unlawful stop, seizure, and search

2

of the Uber and suppress the evidence found as a result of the unlawful stop, seizure, and search of the Uber vehicle on August 21, 2025." (Doc. 18). As an attached inventory of items to be suppressed, defendant included a Waterloo Police Department supplemental incident report dated August 25, 2025. (Doc. 18-1).[1] The government filed a resistance, (Doc. 19), and provided the Court with five exhibits:

1. The judgment from criminal case number 7-CR-93
2. An arrest synopsis sheet and drug chemistry laboratory report for defendant from November 2024
3. A Waterloo Police Department supplemental incident report dated August 5, 2025
4. A Waterloo Police Department supplemental incident report dated August 24, 2025
5. Deputy Jesse Lenz' Body camera footage from August 21, 2025[2]

(Docs. 19-2 through 19-6). Defendant filed a reply, (Doc. 24), and provided the Court with Exhibit A: an excerpt from Deputy Lenz' body camera footage from August 21, 2025. (Doc. 24-1). The government filed a response to defendant's reply. (Doc. 31).

On January 6 and 27, 2026, Judge Roberts held a hearing on the motion. (Docs. 32 & 39). On January 6, the government offered and Judge Roberts accepted Exhibits 2, 3, 4, and 5. (Doc. 32). The government then called five witnesses. (*Id.*; Doc. 50, at 3). First, Investigator Nicholas Berry testified. (Doc. 50, at 6). He stated that he became involved with the investigation of defendant after "[d]etectives came into contact

---

[1] Judge Roberts summarized the items to be suppressed as "two cell phones, two Ziploc bags of methamphetamine, and statements to an investigator at the scene of the traffic stop." (Doc. 56, 1 n.1). At the hearing on defendant's motion, defendant clarified that the items to be suppressed included "the two cell phones that were recovered from [defendant]," "2 pounds of methamphetamine that were found in the trunk of the Uber," and "some statements that could be incriminating in nature." (Doc. 50, at 3–4).

[2] Judge Roberts identified Exhibits 2 through 5 as: "2. Illinois State Police arrest sheet; 3. Law enforcement records (27 pages); 4. Records regarding August 21, 2025 incident; and 5. Body camera video." (Doc. 56, at 2).

3

with a cooperating source [("CS")] who identified [defendant] as a source of supply of methamphetamine." (*Id.*, at 8). That CS was involved in "several controlled buys" involving defendant. (*Id.*). The CS would contact a phone number that law enforcement identified as defendant's and arrange controlled purchases. (*Id.*, at 9). Law enforcement also tracked defendant's travel between Chicago and the Cedar Rapids-Iowa City area in June, July, and August 2025. (*Id.*, at 10). On August 10, defendant got off a Greyhound bus from Chicago carrying a large, black, heavy duffle bag. (*Id.*, at 12). That same day, law enforcement conducted a controlled buy from defendant. (*Id.*). On August 12, defendant also returned from Chicago and was carrying a backpack when he returned to Iowa City. (*Id.*, at 13). Investigator Berry determined that defendant was traveling to Chicago to acquire methamphetamine and bringing it back to Iowa to distribute. (*Id.*, at 14); *see also* (Doc. 19-5, at 1).

Investigator Berry also testified that he reviewed Exhibit 3 and it was true and accurate. (*Id.*, at 10). Exhibit 3 documented controlled buys on June 16, June 19, July 7, July 14, July 22, July 30, August 10, and August 18, 2025. (Doc. 19-4, at 1–4, 11–13, 15–20, 23–27). The substance purchased by the CS on those dates was tested by the Iowa Division of Criminal Investigation's Criminalistics Laboratory, which confirmed that it was methamphetamine. (*Id.*). Five of these controlled buys—on June 16 and 19 and July 7, 14, and 30—were directly from defendant. (*Id.*, at 23–27). The other controlled buys, however, followed the CS contacting defendant, who told the CS where to go for the buy. (*Id.*, at 26). Investigator Berry was present for the seizure and search of the rideshare vehicle defendant was in on August 21, 2025. (Doc. 50, at 41).

Detective Chris Roberts testified next. (*Id.*, at 44). Detective Roberts had reviewed Exhibit 2, which summarized defendant's November 13, 2024 arrest in Illinois for possession with intent to deliver methamphetamine, and he was aware of the general facts surrounding that arrest prior to August 21, 2025. (*Id.*, at 46–47, 58). He also reviewed Exhibit 3 and found it true and accurate. (*Id.*, at 48). Detective Roberts added

that he knew that multiple controlled buys happened after law enforcement knew defendant had just returned from Chicago. (*Id.*, at 49). Detective Roberts was present for the search and seizure of defendant's rideshare vehicle on August 21 as well. (*Id.*, at 52). That day, "law enforcement from the Iowa City Police Department, the Iowa State Patrol, and the Johnson County Sheriff's Office" were all present. (*Id.*, at 52–53). Detective Berry saw defendant "carrying a backpack and duffle bag as he walked to [a] Ford Fusion." (*Id.*, at 69). Detective Berry watched defendant get into a Ford Fusion, keeping the backpack with him but placing the duffle bag in the trunk. (*Id.*, at 69). When asked whether he believed that law enforcement, apart from traffic violations, "had probable cause to stop the vehicle in which [defendant] rode," Detective Berry said, "We did have other probable cause, yes." (*Id.*, at 81). More specifically, he felt that he "had probable cause based on the drug investigation alone[.]" (*Id.*, at 82, 87).

Special Agent Richard Vale testified after Detective Roberts. (*Id.*, at 93). He also assisted with the investigation of defendant on August 21, 2025. (*Id.*, at 95). That day, he became "involved with surveilling a Ford Fusion" that defendant got into. (*Id.*, at 98). He observed that vehicle cross into a bike lane, which he "knew to be a traffic violation." (*Id.*, at 100, 108).

After Special Agent Vale, the government called Trooper Ames Helzer. (*Id.*, at 120). He, like the rest of the witnesses, was involved with the August 21, 2025, traffic stop involving defendant. (*Id.*, at 121). He also authored Exhibit 4, which he stated was true and accurate. (*Id.*). In Exhibit 4, Trooper Helzer describes performing a traffic stop of the Ford Fusion and assisting with collecting and checking identities and criminal histories of the driver of the vehicle and a passenger as well as detaining and transporting that passenger. (Doc. 19-5, at 5).

Lastly, the government called Deputy Jesse Lenz. (Doc. 50, at 134). Deputy Lenz assisted on August 21 as a K-9 handler. (*Id.*, at 135). At the end of that first day,

defendant offered, and Judge Roberts accepted Exhibit A. (*Id.*, at 157; Doc. 24-1, Doc. 32).

On January 27, Judge Roberts held the second day of the hearing. (Doc. 39). That day, defendant offered and Judge Roberts accepted Exhibit B, defendant's Uber receipt from August 21, 2025. (Docs. 36-1; Doc. 51, at 4). Then defendant called Eric Ruth as a witness. (Doc. 39; Doc. 51, at 4). Mr. Ruth was defendant's Uber driver on August 21, 2025. (Doc. 51, at 6–7). Mr. Ruth confirmed that a headlight on his Ford Fusion was not functioning that day. (*Id.*, at 14). He also confirmed that "there was a bag in the trunk that was placed in the trunk by the defendant, and that was the bag that contained the methamphetamine[.]" (*Id.*, at 18). After the hearing, defendant filed a supplemental brief. (Doc. 45). The government filed a resistance to that supplemental brief. (Doc. 47). Defendant also filed a supplemental notice. (Doc. 49).

On March 5, 2026, Judge Roberts issued his R&R, recommending that the Court deny defendant's motion to suppress. (Doc. 56, at 3, 22). The government filed an objection, objecting to two factual findings in the R&R. (Doc. 61). Defendant filed an objection, objecting to Judge Roberts' ultimate conclusion that "law enforcement had probable cause to seize the ride share vehicle transporting the Defendant and to search his property within the ride share vehicle." (Doc. 64, at 1). Given those objections, the Court reviews both the facts and the legal conclusions in the R&R de novo, beginning with the government's factual objection.

### B. The Government's Factual Objection

First, the government objects to two factual conclusions in the R&R. (Doc. 56). To begin, the government objects to the statement in the R&R referencing when Detective Berry observed a brief interaction between defendant and a younger, black male. (Doc. 56, at 11 n.12). The government states the observation occurred on August 8, not August 21. (Doc. 61, at 1). The reference is to a footnote in Judge Roberts' R&R where it states: "Detective Berry described a brief interaction between a 'younger,' 'black male'

6

who left with a duffle bag in another vehicle." (Doc. 56, at 11 n.12). The Court has reviewed the transcript from the suppression hearing as well as Exhibit 3 and finds that both indicate that the interaction occurred on August 10, 2025. *See* (Doc. 19-4, at 21; Doc. 50, at 10–12); *see also* (Doc. 19-1, at 4). The Court also finds however, that Judge Roberts does not clearly identify this interaction as occurring on any date. The Court can see that from the context where Judge Roberts dropped the footnote, one could read it as suggesting this observation occurred on August 21. But Judge Roberts did not say that. Thus, the Court finds no correction necessary, but merely notes that it has found, independently, that the interaction between defendant and a younger, shorter black male with a duffle bag occurred on August 10, 2025. Given that this is only a clarification, the government's objection is **overruled** as to this issue.

Second, the government objects to the statement in the R&R that "[p]rior to the August 21, 2025 traffic stop, law enforcement knew . . . [d]efendant had a prior federal drug conviction[.]" (Doc. 56, at 19). Instead, the government states that it "did not seek to admit Government Exhibit 1 at the suppression hearing" and that "law enforcement did not know that defendant had a prior federal drug conviction." (Doc. 61, at 1–2). The Court has reviewed the entire suppression hearing transcript and did not find any mention of knowledge of a prior federal drug conviction. Likewise, the Court found that the government stated on the record that "officers were not aware of [the prior federal conviction] at the time of the traffic stop but became aware of it after the traffic stop." (Doc. 50, at 5). Rather, "[t]hey learned about it between August 21st and the ultimate arrest in this case." (*Id.*, at 6). The government's objection, therefore, is **sustained** as to this issue. The Court did not consider the statement in the government's resistance to defendant's motion to suppress that references law enforcement's knowledge of this conviction. (Doc. 19-1, at 8). Excepting that one clarification and one correction, the Court adopts Judge Roberts' factual findings in their entirety. To the extent they are necessary, the Court includes additional facts in the legal analysis section below.

### C. Probable Cause to Stop and Search Ford Fusion on August 21, 2025

Second, regarding the legal issues, defendant objects to Judge Roberts' ultimate conclusion that "[d]efendant's history of alleged participation in eight controlled drug transactions, a November of 2024 arrest in connection with his presence within a vehicle in which a large quantity of methamphetamine was found, trips to Chicago, and information from a [CS] established probable cause" to stop and search the vehicle defendant was traveling in on August 21, 2025. (Doc. 64, at 1). The Court takes up this legal issue next.

The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const., amend. IV. "The Fourth Amendment requires law-enforcement officers to obtain a warrant before initiating a search" unless an exception applies. *United States v. Merrett*, 8 F.4th 743, 751 (8th Cir. 2021). One exception is that "during a lawful investigatory traffic stop, officers may search a vehicle without a warrant when they develop probable cause to believe it contains contraband or evidence of criminal activity." *United States v. Williams*, 955 F.3d 734, 737 (8th Cir. 2020) (cleaned up). "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe that there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000) (per curiam).

"In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175, (1949). "[A] judicial determination as to the existence of probable cause should not rest on isolated facts, but rather on 'the cumulative effect of such facts in the totality of the circumstances.'" *United States v. McGlynn*, 671 F.2d 1140, 1143 (8th Cir. 1982) (quoting *United States v. Peep*, 490 F.2d 903, 907 (8th Cir. 1974)). "[T]he probability, and not a prima facie showing, of criminal

activity, is the standard of probable cause." *Spinelli v. United States*, 393 U.S. 410, 419 (1969). Put another way, "[w]hen determining probable cause, the observations of the law enforcement officer must be viewed as a whole." *United States v. Mims*, 122 F.4th 1021, 1031 (8th Cir. 2024).

In viewing circumstances surrounding alleged probable cause as a whole, "it is unimportant that individual corroborating facts appear to exemplify innocent or guilty activities; it is how these facts fit together in the entirety which concerns us." *United States v. Robinson*, 756 F.2d 56, 59–60 (8th Cir. 1985). In addition, in determining whether an officer had probable cause to search, "[a]n officer's training and experience should be taken into account[.]" *Mims*, 122 F.4th 1031. More specifically, an "officer is entitled to consider the circumstances, including arguably innocent conduct, in light of his training and experience." *United States v. Wallraff*, 705 F.2d 980, 990 (8th Cir. 1983). "[C]onduct arguably innocent to the lay person, may be very significant to a trained observer." *McGlynn*, 671 F.2d at 1144. "In making a probable cause determination, law enforcement officers have substantial latitude in interpreting and drawing from factual circumstances." *United States v. Winarske*, 715 F.3d 1063, 1067 (8th Cir. 2013) (internal quotations and citation omitted).

Here, law enforcement officers had the following information about defendant before their interaction with him on August 21: he was a passenger in a vehicle in Illinois in November 2024 in which officers uncovered methamphetamine; he was the seller during controlled buys of methamphetamine on five occasions and arranged the sale for three more in June, July, and August 2025 in Iowa; he traveled back and forth from Iowa to Chicago repeatedly between June and August 2025, carrying a backpack or duffle bag while doing so; and the controlled buys on June 16, July 7, and August 10 were right after defendant returned from Chicago. Taking these facts as a whole, viewing those facts through the eyes of the law enforcement officers that learned them, and considering the cumulative effect of all of those facts on the totality of the circumstances here, the

Court has no problem finding that probable cause existed for both the stop and search of the Ford Fusion on August 21.

The sheer number of interactions plus the pattern here involving drug sales, travel between Iowa and Chicago, and drug sales immediately following that travel, the Court finds signify that a reasonable officer could have believed that there was a fair probability that methamphetamine would be found after defendant returned from Chicago, specifically, given his pattern of selling methamphetamine to the CS close in time to his returns from there. Defendant did so on at least three occasions, and he personally sold drugs to the CS on five occasions while serving as the organizer for three more. Defendant was likewise found by law enforcement officers to be in a vehicle with methamphetamine in Illinois and was the only person around the CS during controlled buys of methamphetamine in Iowa. Taken together, the cumulative effect of all of that information, the Court finds, is that officers had sufficient probable cause.

In his responses, defendant posits innocent alternative explanations for his trips to Chicago, like that lots of people are from there and that it is "a large city with a lot to offer in the summer besides drugs". (Doc. 50, at 18; Doc. 64, at 4). The Court likewise can handily find guilty ones, including that defendant picked up methamphetamine. Officers need not hypothesize innocent explanations for conduct; rather, they may draw rational inferences from the totality of the facts to determine if there is probable cause to believe evidence of a crime may be located in the area to be searched. *United States v. Cotter*, 701 F.3d 544, 547-48 (8th Cir. 2012) (rejecting theory that officers had to accept innocent possibilities for conduct); *United States v. Gaffney*, No. 13–CR–2035–LRR, 2014 WL 794568, at *8 (N.D. Iowa Feb. 27, 2014) (finding that "an arresting officer need not definitively rule out innocent explanations for the way an object feels.").

Defendant also attempts to undermine the credibility of the CS, pointing to their "decent" criminal history. (Doc. 50, at 60). The Court finds that credibility had little to do with the interactions here, as the CS approached defendant five times, handed him

money, and returned with a substance later confirmed to be methamphetamine, all while on constant surveillance and after being searched himself. The CS's criminal history does not undermine the veracity of those interactions given that they were independently controlled and did not depend on the CS's accurate reporting. Most importantly, overall, the Court finds those arguments do not overcome its determination that there was a fair probability that contraband or evidence of a crime would be found inside of defendant's duffle bag when law enforcement searched it on August 21, despite any potential innocent explanations or questions regarding the CS's credibility. Thus, there was no Fourth Amendment violation in either the seizure or the search here. Defendant's objection, therefore, is **overruled** as to this issue.

### D. Other Issues Raised

The Court has found that probable cause supported the stop and search of the Ford Fusion on August 21, 2025. The parties, however, raised various other issues in their various filings. Defendant furthermore wrote in his objection that he "incorporates previous arguments and written submissions as if fully stated herein." (Doc. 64, at 1). Judge Roberts summarized those other arguments as "the validity of the stop based on traffic violations, the length of the stop, [d]efendant's standing, the police dog's trespass, and application of the exclusionary rule[.]" (Doc. 56, at 21). Because the probable cause determination is dispositive, the Court does not address the other, now moot, issues. *Sorcan v. Rock Ridge Sch. Dist.*, 131 F.4th 646, 650 (8th Cir. 2025) (explaining that an issue is moot "when it is impossible for a court to grant any effectual relief whatever to the prevailing party"). Defendant's objection on these other issues is **overruled** and his motion to suppress is **denied**.

## IV. CONCLUSION

For these reasons, the government's objection is **overruled in part and sustained in part**. (Doc. 61). Defendant's objection is **overruled**. (Doc. 64). The Court **adopts as modified** the R&R. (Doc. 56). Defendant's Motion to Suppress (Doc. 18) is **denied**.

**IT IS SO ORDERED** this 7th day of April, 2026.

_____
C.J. Williams, Chief Judge
United States District Court
Northern District of Iowa

12